FRANK GEISINGER, APPELLANT, v. MILNER HOTELS, INC., RESPONDENT. —202 S. W. (2d) 142.

Kansas City Court of Appeals. Opinion delivered May 5, 1947.

*Casemore & Berman* and *Russell O. Casemore* for appellant.

*Harry S. Roberts* and *John F. Cell* of counsel.

*Hook & Thomas, Harry L. Thomas* and *Inghram D. Hook* for respondent.

DEW, J.—Appellant sued in 76 counts to recover in each a penalty of $50, attorney's fee of $50, and for costs, growing out of alleged excess weekly rental payments made for living accommodations over the period alleged. Recovery is sought under the National Emergency Price Control Act of 1942, 50 U. S. C. A., War Appendix, Sections 901, et seq., p. 313, and Section 925 (e) 1946 Supp. p. 183. In pretrial conference it was agreed that the first 25 counts were barred by limitation. Trial by jury was waived and on trial of the remaining 51 counts to the court, sitting as a jury, finding and judgment were in favor of the defendant. Plaintiff's motion for new trial being overruled, he has brought this appeal. The 51 counts involved covered weekly rental payments made consecutively from June 5,

1943 to May 20, 1944, inclusive, of $8.50 each. It is claimed that each payment exceeded the lawful maximum rate by $2.50, and was in violation of the Federal Act mentioned.

The National Emergency Price Control Act of 1942 was for the purpose of stabilizing prices of commodities (including rents for housing in certain areas) in the interest of national defense in the recent World War. It was enacted January 30, 1942 (56 Stat. 23) and was in effect during the period of the plaintiff's claims, and the premises involved were in an area affected by said Act. Under the authority of the Act, the Office of Price Administration (known as OPA) fixed as the basic rates for rentals the highest rate collected in February, 1942. Other regulations were adopted by that office for the administration of the Act.

Under said Section 925(e), before the amendment thereto not applicable here, any person paying for housing accommodations in excess of the maximum rate so fixed was authorized to bring an action, within one year of such payment, against a landlord so receiving the same, for reasonable attorney's fees and costs, as determined by the court, plus either an amount not less than $25, nor more than $50, as the court may determine, or for an amount not more than treble the amount which the payment exceeded the maximum price as the court may determine, whichever is greater.

Incorporated in all of plaintiff's counts are allegations, in substance, that during all the time concerned, the defendant operated the Reid Hotel (formerly the Coates House) in Kansas City, Missouri; that prior to December 12, 1942, plaintiff had rented from defendant in said hotel, as a permanent resident thereof, a double room for the occupancy of himself and three sons; that shortly prior to said date his said sons entered the armed forces of the United States, whereupon plaintiff requested of defendant a single room in said hotel for single occupancy; that on the door of the double room so occupied, there was posted a regulation notice: "Single rate is $6.00, double rate is $8.50"; that plaintiff paid the $8.50 per week for said double room; that defendant agreed to furnish to plaintiff a room for single ocupancy, but requested plaintiff to continue in the double room until such arrangements could be made; that defendant continued to charge the plaintiff the $8.50 for the double room to the date of this action. Plaintiff pleads the Emergency Price Control Act of 1942; alleges that the location of the premises was within a rental area thereunder; that prior to January 1, 1944, single rooms in said hotel had been listed with and fixed by the OPA at the rate of $6 per week for one person and that no change had been made in such rate or in such regulation. He also alleged that upon his request for a single room defendant removed the modern metal furniture in the room occupied by him and substituted wooden furniture, in violation of the regulations of the Act.

Each count alleges the payment by the plaintiff of $8.50 and the receipt thereof by the defendant for the double room aforesaid, together with the date paid for the week ensuing thereafter, and alleges that the same was $2.50 over and above the maximum lawful rental rate therefor.

For answer, defendant admitted the enactment of the Emergency Price Control Act, and denied all other allegations. Defendant further pleaded a release by the plaintiff of the claims made by reason of his dismissal of a former complaint in the OPA office in connection with which plaintiff had stated that defendant was operating the hotel as best it could under the war conditions, and defendant further pleaded an amendment of 1945 to the Act.

The reply was a general denial, and an allegation that the alleged waiver pleaded in the answer did not constitute a waiver of plaintiff's right of action and is no defense thereto, and that the amendment to the Act, as pleaded, was subsequent to the matters complained of, and constitutes no defense.

According to plaintiff's evidence he first moved into the Reid Hotel in 1939. In June of that year he was permitted to move from a single room into Suite 515 because his three sons were coming to live with him. He was then told by defendant's manager that the rate for the latter suite was $6.00 per week single, or $8.50, double. Plaintiff paid the $8.50 rate. The suite was composed of two rooms, 515 and 516, connected by an archway and with entrance only in 515. Room 515 was about 18 feet square, and 516 about 14 x 16 feet. The entrance door to 516 was nailed and a closet built over it. There was a card posted on the entrance door of 515 showing the above rates. Plaintiff's three sons went into the armed services in 1942, the last one leaving in December of that year. When the OPA went into effect that year, a new card was put on the door of 515, showing the rates above quoted. Defendant's audit made of rents charged in February, 1942, on forms prescribed by the OPA, showed Rooms 515 and 516 occupied at $8.50 per week for two persons, and no "offering" for single ocupancy. On the registration of January 26, 1944, the weekly rate for Room 515 was shown to be $6 single, $8.50, double, and showing a double occupancy. Plaintiff continued to pay the $8.50 per week until May 20, 1944, and thereafter paid to defendant's successor $6 per week for the suite. The OPA registration files of October, 1942, showed the suite 515 registered at $8.50 for two persons, and no rate was shown for single occupancy. Plaintiff's sons on various occasions returned on furloughs and on two or three occasions spent the night in plaintiff's quarters. After plaintiff's last son had left for the army, plaintiff asked the defendant's manager for a cheaper room, and was told that none was available at that time, but that if plaintiff would continue in his present location at the present rates "they would fix me up a little later". He asked for a $6

room for single occupancy. Several times he complained about paying $8.50, and requested the cheaper room. He did not move because he had no other place to go. He admitted having joined in a petition of complaint to the OPA, and later asking the OPA to cancel his signature to the petition with the explanation that it was all a mistake. He admitted further there was a double bed in each of the two rooms of the suite and the two rooms had to be rented together as they were then situated.

In behalf of defendant, its manager in charge of the Reid Hotel from August, 1943, to the end of the period in question, stated that Room 515 was a part of a suite composed of connecting rooms 515 and 516; that the suite was set up to accommodate two tenants, but was so arranged that six or eight persons could occupy the suite; that there was a large bed in each room; that it would have been to defendant's advantage to have the suite vacated as there was great need to provide additional space for tenants; that people were sleeping in the lobby and walking the streets at night for lack of sleeping facilities; that plaintiff had paid the rate of $8.50 per week and occupied the suite with his three sons, and after the sons had entered the armed services they would return occasionally, and without registering, would share the rooms with plaintiff; that plaintiff insisted on retaining the rooms so that the boys could have a home to come to whenever they returned; that plaintiff told the witness to let them have a key whenever they asked for it, which was done on various occasions without any additional charge. He testified that plaintiff had not asked for a reduction of the rate.

The wife of the former manager, above mentioned, testified that plaintiff had stated he wanted to retain the suite as a home for his boys. She said that when the audit was made for the OPA she accompanied the auditor and removed the old rate card from the door of 515. This card (Deft's Exh. 5) showed that it was printed by a firm in Kansas City, Missouri. It read: "Notice—In accordance with requirements of OPA Regulation 1388.1557 the maximum rate of this room follows: 1 person per day, $1.50; per week, $8.50; 2 persons per day, $2.50; 3 persons per day, $3.00; per week, $8.50. Additional persons 50 Cents". The room number "339" written on the card and certain rate figures had been canceled by lines drawn through the same, and room number "515" in different ink inserted with the above rates. She said she had seen one of the plaintiff's sons visit plaintiff in 515 and the son's wife accompanied him, and they spent the night in the suite.

The deposition of the plaintiff was introduced wherein he testified as to the location of his sons after entering the armed services, all such places mentioned being in the United States. All had been inducted in Leavenworth, Kansas. One was thereafter stationed for 29 months at Fort Riley, Kansas, and the others near Laredo, Texas.

One son came to Kansas City every three or four months on furloughs and would visit plaintiff, but spent nights elsewhere in the city.

Another witness, who was manager of said hotel for the defendant for a period of two years from September, 1940, testified for the defendant that Rooms 515 and 516 were combined as an apartment or suite with only one entrance, 515; that the two rooms would cover an area of 100 feet x 40 feet and were connected by an archway. They were located on the corner of the hotel building and their location was one of the most desirable in the building; that there was room for kitchen facilities if desired, and for four beds. Witness prepared the forms of rates for the OPA and used the same rate for 515 and 516 of $8.50 per week, which plaintiff had been paying for more than a year prior thereto. He said this rate was filed with the OPA and showed $8.50 per week for the two rooms; that another sheet filed with the OPA for the period from January 31, 1942 to March 1, 1942, showed the rate of $8.50 per week for the two rooms together. He said plaintiff's boys entered the armed services at different times, and plaintiff continued to occupy the suite and said nothing about reducing his rates; that the boys returned occasionally, had access to the key and came and went as they desired, no additional rental charge being made. He said plaintiff complained once about maid service, and had signed a complaint with the OPA, but withdrew his name from the petition. No other rates except $8.50 per week had been charged for the two rooms and, as arranged, they had to be rented together.

It was brought out that the OPA listing in January, 1944, showed Rooms 515 and 516, listed separately, 515 at the rate of $6 per week single, and 516 at $4, or $10 for both; and 515 at $8.50, double, and 516 at $8, or $16.50 per week for both rooms.

In rebuttal plaintiff denied he had ever seen the rate card which defendant's witness had said was on the door of 515 when plaintiff first ocupied the room and which was removed when the OPA took effect (Deft's Exh. 5). However, in his deposition he had said it was similar in type to the one then on the door which he said gave the rate of $6 per person per week and $8.50 for two, and he could not say whether it was the same card as the one claimed to have been removed. He denied that the previous complaint from which he had withdrawn had anything to do with the rent.

The court refused the findings of fact submitted by the plaintiff except that the defendant operated said hotel during said period, and that the present cause is governed by the Emergency Price Control Act of 1942, and before the amendment of June 30, 1944. The court refused the conclusions of law submitted by plaintiff except that the Emergency Price Control Act is remedial in its nature.

At the request of the defendant the court included in its findings of fact that $8.50 per week was the only rate or charge made for the

space occupied by plaintiff; that such rate was maintained regardless of the number of occupants; that defendant's manager had called on the OPA and was advised that the charge made for plaintiff's space was within the regulations; that defendant acted in good faith in making the charge; that plaintiff requested to be permitted to retain the rooms after his sons entered the army in order that they might have a place to come on furlough; that the sons used the rooms for such purposes; that for whatever furniture was removed from Rooms 515 and 516, other furniture of substantially the same quality was placed there.

Of the conclusions of law requested by the defendant the court gave only the following: "The plaintiff, upon the pleadings and the evidence has not made out a case. Second. The plaintiff's attorneys are not entitled to recover".

The memorandum opinion of the court recited that plaintiff and his three sons had moved into Rooms 515 and 516 in June, 1939; that the suite was referred to as 515, as the door was in that room; that these rooms were large and contained double beds; that the weekly rental paid therefor continuously was $8.50, and plaintiff and his sons occupied the same until the last son entered the army in 1942, when plaintiff continued to occupy the same at the same rate; that no weekly rate of $6 for single occupancy had ever been posted on the door, and that no such single occupancy rate existed, and that when the space was registered with the OPA on October 12, 1942, it was registered on a weekly basis and for double occupancy only, and did not at that time show the rooms separately; that on January 26, 1944, a new audit was made for the OPA at which time Rooms 515 and 516 were separately listed, 515 on a weekly basis of $6 for single occupancy, and $8.50 for double occupancy; Room 516 on a weekly rate of $4 for single occupancy, and $8 for double occupancy. The court stated that it was of the opinion that plaintiff had occupied the rooms for three years prior to 1942 with his sons but that defendant did not offer same for single occupancy, and the court did not believe that a rate was ever posted on the rooms showing a single weekly rate. The court further stated its belief that the plaintiff stated his desire to hold the rooms so that his sons could occupy them when in Kansas City, and that if plaintiff had desired to give them up, defendant would have furnished him a smaller and cheaper room. The opinion concluded with the statement that plaintiff had failed to sustain the allegations of his petition.

Motion for new trial was filed, including points made herein. The same was overruled and the appeal perfected.

Appellant sets forth, separately from his points, assignments of error, wherein contentions are made that (1) the judgment was for the wrong party, the credible evidence preponderating in plaintiff's favor; (2) the case was erroneously tried on the theory that

the Emergency Price Control Act was penal rather than civil and re-
medial; (3) the trial judge was prejudiced against the statute in
question and admitted incompetent evidence. The points relied on
are academic in form and are (1) the statute is not penal but re-
medial; (2) the trial judge, sitting as a jury, should be unbiased. We
shall consider the points as applied to the assignments of error.

In each of plaintiff's original 76 counts he prayed for a $50 "pen-
alty", plus attorney's fee of $50, and costs. At the request of the
plaintiff the court included in its conclusions of law the ruling that
the Emergency Price Control Act of 1942 was remedial in its nature.
Of course, if purely remedial, the Act should be liberally construed.
Plaintiff now asserts that the statute is not penal, and that the case was
tried throughout on the theory that the Act was penal and not re-
medial. Appellant cites one incident to substantiate this contention.
Upon objection by plaintiff, defendant withdrew that part of the
deposition of the plaintiff read to the court touching upon what
plaintiff had said to defendant's manager regarding the withdrawal
from the former complaint. Later, upon the further reading from
that deposition, the court said:

"It occurs to me that possibly you are entitled to go into what
he said over at the OPA, and all this is a penalty they are asking
you to pay, it is not for compensatory damages, and it is the
penalty statute nevertheless because it is attempting to penalize
somebody, and I think you can go into that, whatever was said
over at the OPA and the complaint that was made. I am going
to hear all that testimony, if you want to go into it, and reserve
rulings on it until a later date. In other words, if it is a penalty
statute I am entitled to go into all the facts and circumstances".

In further connection with the matter the court said:

"The complaint he made and withdrew it. I want to make that
a little clearer, what happened. Apparently he made a com-
plaint to the OPA office, then he withdrew it, and you were getting
into whether he was satisfied or not, and what was said between
him and the hotel people. Not what he said to the OPA people
or what they said to him. I don't care.

"Mr. Cell: (Of counsel for plaintiff) Well, that is all right.

"Mr. Roberts: (Of counsel for plaintiff) You mean as to what
the hotel said to him?

"The Court: What he said to the hotel people about withdraw-
ing the charge.

"Mr. Roberts: Well, I think that is all right.

"The Court: Let us clarify that a little bit".

Further inquiry, however, did not bring out the conversations re-
ferred to except that they had nothing to do with the rent. Further-
more, plaintiff's counsel agreed that the further inquiry might be
made. No other incident is cited to prove that the court considered

the statute penal or remedial, except the declaration at the close of the trial that it was remedial, nor is there anything of record to show that the court placed any stricter construction on the statute than it required.

Statutes may be both penal and remedial. "A statute has been regarded as both remedial and penal, where it gives a right of action for an injury suffered by an individual, and also imposes a forfeiture for its violation". Am. Jur. Vol. 50, Stats., Section 17, p. 36; Strait v. Yazoo.& M. V. R. Co., 209 F. 157. While the statute involved has been held not penal in nature by some courts (Bowles v. Montgomery Ward & Co., 143 F. (2d) 38; Bowles v. Kroger Grocery & Baking Co., 141 F. (2d) 120), it has been held by the greater weight of authority to be penal in nature as here applied. It was said in Bowles v. Farmers Nat. Bank, 147 F. (2d) 425, 428, in speaking of the enforcement statute in question:

"Hence we conclude that the manifest purpose of Section 205 (e) was to prevent the inflationary tendencies sought to be curbed by the Act as a whole, through punishment of violators of the statute by payment of penalties either to the Administrator or to the person injured. The amount of such payments, if made to the injured person, supplies a direct and powerful incentive for the enforcement of the Act by the individual. . . . the treble damages provision is intended to be sufficiently attractive to stimulate an aggrieved person to recover his losses and to enforce the law; and it is also intended to be sufficiently burdensome to deter potential violators and to punish actual violators".

See, also Porter v. Crawford & Doherty, 154 F. (2d) 431; Bowles v. Silverman, 57 F. Supp. 990; Husers v. Papania, 22 So. (2d) 755.

In our opinion, as here applied, the Act is both penal and remedial in its character.

Appellant's second point is that the court was biased and prejudiced against the Emergency Price Control Act. We understand, from the specifications, that appellant contends that such alleged prejudice induced the court to admit incompetent evidence, but such evidence is not specified. Several instances are cited in the argument in his brief to establish this point. Just prior to calling as a witness for plaintiff an inspector for the Area Rent Division of the OPA, counsel for plaintiff explained to the court a rule of that office to the effect that their files should not be offered in evidence as exhibits because of the consequent interference with the efficiency of such files, and counsel suggested that evidence therefrom could be read into the record after identification. Counsel stated that he had promised the witness that the rule would be observed. Thereupon the court said:

"They cannot make any rules over here. . . . If it is going to clutter up the record and we cannot get a good record on it,

I am not going to follow any of their rules. Why can't we mark it as an exhibit like any other case?''

Counsel then again explained the rule and his promise to the witness, whereupon the court asked counsel for the defendant if it was agreeable to dictate into the record from the documents in question. Defendant's counsel consented. The court then said:

''I just hate these bureaucratic people that tell you what you can do in your courtroom. I know, I am not blaming you. If it is agreeable, it is all right, but I am not—

''Mr. Hook (Counsel for defendant, interrupting) Government by bureaucracy.

''The Court: They tell the courts how they should function, when they should function, and why they should function. I could impound the records if I wanted to, but if it is agreeable on both sides you can read them in''.

Thereafter, dictation from time to time was made into the record from the OPA books and records. Court and counsel thereupon expressed satisfaction with the dictation of the contents. Appellant again cites the court's statement, heretofore quoted, regarding the penal nature of the statute. He also cites the fact that at the hearing of the motion for new trial the court said he should not consider the evidence as to what was the rate charged for Room 515 by defendant's successor after the period for which the claims herein were made, although such evidence had been received without objection.

The appellant's brief does not point out, but the record discloses many rulings by the court sustaining the plaintiff on the matter of competency of the evidence.

The court's expression of dislike for the ''bureaucratic'' methods of withholding documentary evidence from the usual methods of identification and filing of exhibits, was not an indication of prejudice against the statute in question. At most it was a criticism of the administration of the Act by those entrusted to administer it. It was material to plaintiff's case that the OPA records be in evidence and considered, and the court's remarks manifested its concern not that such evidence be excluded, but that it be placed fully before the court and counsel and preserved for use in that court and on possible appeal. It was the duty of the court to be solicitous that material evidence be properly identified and preserved. We cannot find that the remarks of the court relative to the privilege extended to the OPA records showed prejudice against the law itself on which plaintiff based his action. Upon learning that the exceptional procedure was agreeable to both counsel, the court permitted it and later both court and counsel expressed satisfaction with the preservation of the substance of the dictated records.

The court's repeated application of the word ''penal'' in respect to the Act was justified as we have pointed out, although the court,

in its declarations of law, declared the Act remedial. No evidence was erroneously admitted or excluded because of the court's view of the nature of the Act. As stated, we hold it to be both remedial and penal.

The court's statement upon hearing the motion for new trial that he did not think he should consider what defendant's successor charged for the rooms in question, although in evidence without objection, was harmless as, in fact, such evidence, although before the court, would throw no light on the question whether defendant's rates were legal or illegal, when charged. Whether the rate later charged by the succeeding owner or operator of the hotel was proper under the Act was an issue that was not and could not be determined in this case, and was immaterial.

Under Section 114(d) of the Code (Laws of Mo. 1943, pp. 353-397), while we may review all the evidence and the law in a jury-waived case, such as this, we are enjoined therein that ''the judgment should not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses''. It is evident from the court's memorandum opinion that his findings of fact from the conflicting testimony were very largely based on its judgment of the credibility of the witnesses. Under the record before us we defer to the finding of the trial court as to the true facts in the case, and cannot find that the judgment is clearly erroneous in any respect. There was substantial evidence to support it.

In view of the foregoing, the judgment should be affirmed. It is so ordered. All concur.